Robert N. LIANG and Susan A. Liang, Appellants,

v.

DEAN WITTER AND CO., INC., et al.

No. 75–1868.

United States Court of Appeals, District of Columbia Circuit.

Argued 13 April 1976.

Decided 16 July 1976.

As Amended 6 Oct. 1976.

Rehearing Denied 15 Oct. 1976.

---

Thomas Lumbard, Washington, D. C., for appellants.

Steven A. Winkelman, Washington, D. C., for appellees.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

Securities and Exchange Commission Rule 10b–16 [1] requires, among other manda-

---

1. 17 C.F.R. § 240.10b–16.

tory disclosures, a broker to provide to a customer with a margin account[2] a written statement of "the conditions under which additional collateral can be required." In connection with the margin account opened with Dean Witter & Company, Inc., (Dean Witter) by the appellants, the appellees informed the appellants in writing that Dean Witter may require "such additional collateral as, in our sole discretion, we determine is necessary as security for your obligation to us." The question presented by this case is whether such notice constitutes full compliance with the disclosure requirement of Rule 10b–16. The District Court for the District of Columbia (Corcoran, J.) dismissed the complaint "for failure to state a claim upon which relief can be granted." For reasons more fully explained below, we reverse and remand for further proceedings.

## I

On 7 April 1972 Robert and Susan Liang (the Liangs) opened a margin account with Dean Witter.[3] Dean Witter assigned Roger Carter, the other appellee, as its customer representative for the Liangs' account. At the time of the opening, the Liangs signed a standard form "Customer's Agreement" supplied by Dean Witter;[4] soon afterwards the Liangs also received another standard form from Dean Witter entitled "Credit Charges."[5]

The "Customer's Agreement" provides in pertinent part as follows:

2. In a margin account, the broker lends the customer money to allow him to purchase securities. The customer advances only a portion of the purchase price and pays interest on the balance. The broker maintains the securities purchased as collateral. If the value of the securities declines, the broker may seek more collateral for the protection of his "loan."

3. The District Court dismissed the complaint on motion, before the trial, on the grounds that, as noted above, the cause of action failed to state a claim upon which relief could be granted. The facts stated herein are taken from the recitations of appellants in the complaint. Various documentary evidence has also been stipu-

7. You are hereby authorized, in your discretion, should the undersigned die or *should you for any reason whatsoever deem it necessary for your protection,* to sell any or all of the securities and commodities or other property which may be in your possession or which you may be carrying for the undersigned . . . . Such sale . . . may be made according to your judgment and may be made, at your discretion . . . without advertising the same and without notice to the undersigned. (emphasis added).

The "Credit Charges" form reads in part:

5. LIENS AND COLLATERAL—As provided in our Customer's Agreement, we have a general lien upon all securities which we hold for you for the discharge of all your obligations to us, however arising and irrespective of the number of accounts you maintain. *We may at any time require you to deposit cash or such additional collateral as, in our sole discretion, we determine is necessary as security for your obligation to us.* (emphasis added).

On 18 July 1973 Dean Witter wrote to the Liangs that "At the present level of prices there is not sufficient margin in your account to protect it."[6] Dean Witter "therefore" requested $2600 in additional collateral, asking for "immediate attention" by 1 August 1973. In neither the letter nor in subsequent communication, despite inquiry from the Liangs, did Dean Witter explain the exact basis for the lack of "sufficient margin." As the demand for the additional collateral was not met,[7] Dean

lated by counsel and is contained in an Appendix to Brief for Appellant.

4. Exhibit B to appellees' motion to dismiss, App. at A–9.

5. Exhibit A to appellees' motion to dismiss, App. at A–8.

6. Appellants' Exhibit, App. at A–5.

7. Appellees followed the letter with a series of telegrams repeating the request and warning of foreclosure. The Liangs claim that appellees had reason to know they would not receive the telegrams until after 20 August 1973; the Liangs claim to have told Carter that they would be vacationing out of the country in

Witter conducted two sets of sales of securities from the Liangs' account, one on about 8 August and the other on about 13 August. Upon learning of the sales by appellees,[8] the Liangs demanded the replacement of the securities and, upon refusal, sued in the District Court for the difference between the amount realized by the sales in August 1973 and the amount that the securities could have been sold for "within a reasonable time thereafter."[9] The District Court had jurisdiction under 15 U.S.C. § 78aa.

Appellees moved to dismiss the complaint under Fed.R.Civ.P. Rule 12(b)(6) on the grounds that the documents received by the Liangs "satisfy the requirements of Rule 10b–16." The District Court granted the motion to dismiss, without opinion, and this appeal followed. This court has jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

## II

Rule 10b–16 provides in part as follows:

(a) *It shall be unlawful* for any broker or dealer *to extend credit*, directly or indirectly, to any customer in connection with any securities transaction *unless* such broker or dealer has established procedures to assure that *each customer*

(1) *is given or sent at the time of opening an account, a written statement or statements disclosing* (i) the conditions under which an interest charge will be imposed; (ii) the annual rate or rates of interest that can be imposed; (iii)

the method of computing interest; (iv) if rates of interest are subject to change without prior notice, the specific conditions under which they can be changed; (v) the method of determining the debit balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts; (vi) what other charges resulting from the extension of credit, if any, will be made and under what conditions; and (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and *the conditions under which additional collateral can be required* . . . . .

(b) It shall be unlawful for any broker or dealer to make any change in the terms and conditions under which credit charges will be made (as described in the initial statement made under Paragraph (a) of this Rule), unless the customer shall have been given not less than thirty (30) days written notice of such changes, except that no such prior notice shall be necessary where such changes are required by law . . . . . (emphasis added).

Since this case calls for one of the first judicial interpretations of Rule 10b–16,[10] it may be helpful to set out its history in some detail, particularly since this interpretation may require the revision of some of the forms that seek to comply with Rule 10b–16. When Congress passed the Truth in Lending Act in 1968,[11] it expressly exempted securities accounts from its coverage.[12]

---

August and would not return until the 20th. (The allegation about the Liangs' communication with Carter informing him of their vacation plans was not set out in the complaint but in the brief. Appellant's Br. at 7. Under a review of a 12(b)(6) motion, the facts taken as admitted are those pleaded in the complaint. This factual issue, however, is not material to the disposition of the legal question in this appeal.)

**8.** The record does not appear to indicate when the appellants first found out about the sales.

**9.** Complaint paragraphs 15, 16; App. at A–4.

**10.** The only other opinion this court has found which interprets Rule 10b–16 is *Stephens v.*

*Reynolds Securities, Inc.*, 413 F.Supp. 50 (N.D. Ala.1976). Without extensive discussion of Rule 10b–16, the court found compliance with Rule 10b–16(a)(1)(ii) and (iii) in a disclosure that the annual interest rate on a margin account would be one half of one percent above the broker's call money rate in New York City and that the method of computing the annual rate would be based upon a year of 360 days, as utilized in a formula set out for the customer.

**11.** Pub.L.No.90–321, 82 Stat. 146, 15 U.S.C. §§ 1601 *et seq.*

**12.** 15 U.S.C. § 1603(2).

The Senate Report noted:

> The Committee has been informed by the Securities and Exchange Commission that the Commission has adequate regulatory authority under the Securities Exchange Act of 1934 to require adequate disclosure of the costs of such credit. The Committee has also been informed in a letter from the SEC that "the Commission is prepared to adopt its own rules to whatever extent may be necessary."
>
> In recommending an exemption for stockbroker margin loans in the bill, the Committee intends for the SEC to require substantially similar disclosure by regulation as soon as it is possible to issue such regulation.[13]

The House Report agreed.[14]

Rule 10b–16 represents the SEC implementation of the instruction from Congress. It was adopted on 1 December 1969,[15] after notice and comments, and became effective 1 April 1970. The SEC authority for the Rule is derived, of course, from the prohibition in Section 10(b)[16] of the Securities Exchange Act of 1934 against the use of "any manipulative or deceptive device" in connection with the purchase or sale of any security. Tracking the express purpose of the Truth in Lending Act,[17] the SEC announced the disclosure sought by Rule 10b–16 as follows:

> The initial disclosure is designed to insure that the investor, before his account is opened, understands the terms and conditions under which credit charges will be made. This will enable him to compare the various credit terms available to him and to understand the methods used in computing the actual credit charges.[18]

The goals enunciated above with regard to credit charges should also animate our review of compliance with 10b–16(a)(1)(vii).

An investor may very well wish to shop around for a securities firm with the most favorable package of terms about additional collateral. Once an account is opened, an investor may also wish to understand more exactly when additional collateral will be required, especially since, as here, the failure to supply it may result in a sale of securities from the customer's account. Thus, our review of the compliance with 10b–16 attempted by Dean Witter can be measured against the purposes of disclosure set out by the SEC and by Congress.

### III

Appellees furnished the Liangs with notice that additional collateral can be required "as, in our sole discretion, we determine is necessary as security for your obligation to us."[19] Appellees contend that such notice is adequate disclosure under 10b–16(a)(1)(vii) because it informs the customer of the "policy" of the firm, i. e., "in the final analysis," the discretion of the broker really is the basis of a decision to call for more collateral. Appellees further contend that since 10b–16 does not require the broker to develop general rules or standards it is adequate to disclose simply its "policy" of discretion. Such disclosure serves the purposes of the Rule, appellees maintain, because a customer dissatisfied with the Dean Witter "policy" could choose another broker.

On the basis of the record before this court, it is not yet possible to decide the compliance here with 10b–16(a)(1)(vii). As appellees correctly claim, Rule 10b–16 does not require a brokerage firm to formulate any certain standard as to when it calls for additional collateral, but merely to disclose fully whatever standard the brokerage house actually employs. A firm may choose to operate on an entirely individual custom-

---

**13.** S.Rep.No.392, 90th Cong., 1st Sess. 9 (1967).

**14.** H.Rep.No.1040, 90th Cong., 1st Sess. (1967), 1968 U.S.Code Cong. & Adm.News 1962, 1986.

**15.** Securities Exchange Act Release No. 8733, 34 F.R. 19717.

**16.** 15 U.S.C. § 78j(b).

**17.** See 15 U.S.C. § 1601.

**18.** Securities and Exchange Act Release No. 8733, 34 F.R. 19717.

**19.** For full text of the relevant disclosures, see *supra* at 3.

er basis, without any general internal guidelines whatsoever; accordingly, it would only have to disclose that discretion is its sole guide. Under such circumstances the documentation furnished by Dean Witter here would be sufficient.

██ A firm, however, may prefer to develop "in-house" standards or rules with regard to minimum margin requirements, foreclosure timetables, and the like.[20] A firm may exercise some discretion in each and every application of these rules but choose to follow its rules as a general guide. Under these circumstances, a firm does, in fact, know "the conditions under which additional collateral can be required," and must disclose its actual policy.[21]

As a restatement of its position, this court adopts the following selection from the SEC amicus brief [22] filed in this case:

> To the extent that Dean Witter or other broker-dealers have adopted and invoke a general policy with respect to additional collateral, either in all cases or in a substantial number of cases such that invocation of that policy in a particular case is significantly probable, the failure to disclose that policy, in our view, would constitute a violation of Rule 10b–16. It may well be that a particular broker-dealer acts only on an informal, *ad hoc* basis, and in such cases, it would be sufficient to disclose that the broker-dealer

deems it necessary to do so in order to protect its loan. But, where a broker-dealer has established a general policy which does not give regard to individual customers, it is, in our view, misleading to suggest that each possible need for additional collateral will be considered on an individual basis.

██ The SEC reading of its own Rule, moreover, appears calculated to serve the purposes of its adoption. By disclosing the "rules of thumb" of a firm to its customers, Rule 10b–16 allows for a more informed, intelligent use of credit. The instant case may be an apt example. If in fact Dean Witter employed an across the board rule establishing minimum margin requirements—even if some discretion in the application of that rule also existed—communication of that fact to the Liangs would have enabled them to monitor their account to anticipate and plan for the call for additional collateral. A securities firm policy that reserved some discretion in its application of its general rules would still provide some guidance to the customer, certainly beyond a disclosure of discretion alone. And to the extent that variations from the disclosed rules are themselves based on separate standards, *e. g.*, how credit rating or account size affect the minimum margin requirements, then the separate standards for the variations should be disclosed under 10b–16.[23] All in all, it must be remembered

---

**20.** *See, e. g., Gordon v. duPont Glore Forgan, Inc.*, 487 F.2d 1260, 1261 (5th Cir. 1973), cert. den., 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 666 (1974):

> Appellant [brokerage firm] set its own margin maintenance requirement at thirty percent, and its computer is programmed to give a warning when margin accounts fall below that level.

**21.** § 29(a) of the Securities Exchange Act, 15 U.S.C. § 78cc(a), declares void any provision binding a person to waive compliance with an SEC Rule. Neither the "Customer's Agreement" nor the "Credit Charges," therefore, can be read as securing the agreement of the customer to forego the information that must be disclosed under Rule 10b–16.

**22.** Amicus Brief of the Securities and Exchange Commission, at 7. The SEC submitted its brief in response to a request from this court. The

parties in this case have also filed memoranda in response.

**23.** Obviously, if the policy disclosed under Rule 10b–16(a)(1)(vii) sets out the firm's general rules but reserves some discretion in the firm to depart from those rules, then a customer may be unable to plan with unshakable predictability. Indeed, appellee cautions that such disclosure "could actually engender false reliance upon guidelines which, when difficulties arose, could be set aside in favor of a discretionary call." Appellees' Supp. Memo at 8. A broker's discretion to depart from his disclosed rules is not entirely unlimited, however. As noted above, variations from stated rules may themselves be predicated on *general standards* that call for disclosure under 10b–16(a)(1)(vii). Furthermore, the discretion of the broker is always subject to substantive review under his fiduciary duty of care, *cf. Gordon v. duPont Glore Forgan, Inc.*, 487 F.2d 1260 (5th Cir. 1973), cert. den., 417 U.S. 946, 94 S.Ct. 3071, 41

that Rule 10b–16, like the Truth in Lending Act, is a rule of disclosure for the benefit of the customers; it is not a rule for the financial safety of the brokerage firms.

Our interpretation of the SEC Rule should also allow a customer to shop around more effectively for a margin account. Firms with "in-house" standards which reveal only that "discretion" controls may, in effect, take themselves out of the market place for the customer who seeks to compare terms more precisely. To the extent many such firms reveal only "discretion," the range of choice of the consumer may be substantially curtailed, even though the "in-house" standards may well vary widely. The "blind" economic choice which then ensues for the customer is one of the evils which both the Truth in Lending Act and Rule 10b–16 were enacted to prevent.[24]

On remand, the District Court must ascertain whether the decision of Dean Witter to require additional collateral was based upon an ad hoc exercise of discretion or rather upon standards employed internally as a matter of general policy. If the latter, the court must then consider whether the standards thus utilized were disclosed as required by our reading of Rule 10b–16(a)(1)(vii) and what recovery,[25] if any, is appropriate for any noncompliance with that Rule.

*So ordered.*

---

L.Ed.2d 666 (1974), and under the "know your customer" rules of the exchanges, *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith*, 410 F.2d 135 (7th Cir. 1969), cert. den., 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969).

**24.** *See Mourning v. Family Pub. Serv. Inc.*, 411 U.S. 356, 363–69, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

**25.** It may safely be assumed that noncompliance with Rule 10b–16 provides the basis for a private cause of action. It is already established that a violation of Rule 10b–5, a rule of disclosure analogous to Rule 10b–16, implies a civil remedy. *Supt. of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Our recognition here accords with the view that "private enforcement of Commission rules may '[provide]

a necessary supplement to Commission action.'" *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975), *quoting J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

Still remaining, however, is the determination of whether recovery under Rule 10b–16 requires that the wrongdoer have acted with "scienter," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("scienter" a necessary element for damages under Rule 10b–5), or with some lesser degree of error, *cf. Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161 (7th Cir. 1974) (mistake of law not adequate bar to civil liability under Truth in Lending Act). Whatever it determines to be the requisite standard of error for recovery, the trial court, of course, must also find either that the appellants have adequately alleged in their complaint or that the complaint may appropriately be amended to allege it.