Jerome **ABELES**, et al., Plaintiffs,

v.

**OPPENHEIMER & CO., INC., et al.,** Defendants.

No. 83 C 1468.

United States District Court,
N.D. Illinois, E.D.

Nov. 7, 1983.

Roger B. Harris, David C. Roston, Altheimer & Gray, Chicago, Ill., for plaintiffs; Perry Goldberg, Specks & Goldberg, Ltd., Chicago, Ill., of counsel.

James E. Beckley, J. David Montague, Richard S. Schultz, James E. Beckley & Associates, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

### I. *Introduction.*

This is a suit for damages and other relief with respect to two contracts for the sale of Government National Mortgage Association ("GNMA") certificates. Plaintiffs, Jerome and Betty Abeles ("the Abeleses"), and members of the class they seek to represent, allegedly contracted with defendants, Oppenheimer & Co., Inc., and Oppenheimer Government Securities, Inc. (collectively "Oppenheimer"), to buy GNMA certificates. For reasons discussed in more detail below, the parties did not perform in accordance with those contracts. The case is before the court on defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### II. *Factual Background.*

A GNMA certificate represents an interest in a pool of mortgage loans. In that sense, it is like a share in a mutual fund, which represents an interest in a stock portfolio. The GNMA, an agency of the federal government, guarantees the timely payment of the principal and interest payments on the loans. The issuers are usually mortgage bankers who earn their compensation by organizing the pools. The purpose of the pooling is to make individual long-term mortgages more marketable.

GNMA certificates pay a fixed interest rate. Consequently, when the market interest rate increases, the market price drops because the bond pays less relative to the market interest rate. Because it

may take issuers several months to assemble a pool of loans, the issuers are subject to the risk that the market interest rate could rise and the market value of the loans could fall before the pool is organized. To avoid this risk, issuers sell "forward": they contract to deliver GNMA certificates on a future date (the "settlement" date) at a price fixed on the date of the contract (the "trade" date). Typically, the issuer sells to a dealer or broker who in turn finds a buyer. The buyer gambles that before the settlement date the price of the certificates will rise.

In addition to this market risk, the sellers and buyers face the risk that the other party to the contract will not perform on the settlement date. If the price of the certificate falls in the interim period, the buyer may refuse to pay the contract price and accept delivery. Conversely, the seller might refuse to deliver the certificates at the contract price if the certificates have risen in value in the interim.

One way to ensure against this risk is to have one or both of the parties deposit with the other or a third party a sum of money to be forfeited if performance is not forthcoming. SEC regulations require such a deposit from the dealer to the issuer in forward sales of GNMA certificates. 24 C.F.R. § 390.52(a)(1). The amount of the deposit may vary as price changes indicate that a greater or lesser sum is necessary to ensure performance. The same device is used to secure performance of commodities futures contracts traded on commodities exchanges; in that situation, the commodities exchanges set the minimum deposit requirements. *See* Johnson, *Commodities Regulation* § 1.10, p. 32.

Some GNMA certificates with future delivery dates are traded on organized commodity exchanges and are thus subject to their deposit rules. *Bache Halsey Stuart, Inc. v. Affiliated Mortgage Investments, Inc.,* 445 F.Supp. 644, 646 (N.D.Ga.1977). Many, including those at issue in this case, are not. Because these are contracts between dealers and buyers, rather than issuers and dealers, the SEC regulations which require deposits in GNMA transactions do not apply. Since they occur off the exchanges, the exchange rules also are inapplicable. These dealer-buyer transactions are, however, individually negotiated, *id.,* and the parties may use contract terms to protect themselves from the risk that on the settlement date the other party will refuse to perform.

### III. *The Complaint.*

■ In ruling on a motion to dismiss, the court must "take [the plaintiff's] allegations to be true, and view them, together with reasonable inferences to be drawn therefrom, in the light most favorable to the plaintiff." *Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981). The parties join issue in their briefs as to the precise nature of the contracts between them, but these factual disputes are inappropriate when the case is before the court on a motion to dismiss. The facts as outlined below are those which the plaintiffs allege in their complaint.

The Abeleses "purchased" GNMA certificates from Oppenheimer, and the parties agreed that Oppenheimer would deliver the certificates at a later date. Complaint ¶ 15. From the use of the word "purchase," the court infers that the plaintiffs allege that the parties intended to transfer title to the certificates to the Abeleses as of the trade date, or as soon thereafter as Oppenheimer acquired the certificates. The contracts provided that if the price of the certificates rose before the delivery date, the Abeleses would sell them back to Oppenheimer at a profit. Complaint ¶ 12(d).

The contracts required the buyers to deposit on the trade date cash or securities equal to 10% of the face value of the certificates, on which Oppenheimer would pay interest. Complaint ¶ 12(b), (c). Oppenheimer retained the right to require additional deposits if it deemed its security insufficient in light of changed market conditions. Complaint ¶ 12(e). A failure to provide such additional security would constitute a repudiation of the contract and give Oppenheimer the right to dispose of the certificates on the buyer's account.

Complaint ¶ 12(f). Plaintiffs were not informed that additional security could be required or that a failure to provide it would result in the sale of the certificates. Complaint ¶ 20.

The price of the certificates purchased by the plaintiffs decreased between the trade date and the delivery date. Complaint ¶ 16. Oppenheimer called for additional security, which was not forthcoming, and Oppenheimer disposed of the certificates at a loss. Complaint ¶ 17.

## IV. Discussion.

The plaintiffs bring this suit under Rule 10b–16 ("the Rule") of the Securities and Exchange Commission ("SEC"), which states in relevant part:

> "(a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer
>
> (i) Is given or sent at the time of opening the account, a written statement or statements disclosing ... (vii) ... the conditions under which additional collateral can be required."

17 C.F.R. § 240.10b–16. The SEC issued the Rule pursuant to § 10(b) of the Securities Exchange Act of 1934. 15 U.S.C. § 78j(b). The Rule is the SEC's response to an exemption granted to securities dealers from the requirements of the Truth in Lending Act ("the TILA"), 15 U.S.C. § 1601 et seq. The Senate Report on that legislation stated that:

> "The Committee has been informed by the Securities and Exchange Commission that the Commission has adequate regulatory authority under the Securities Exchange Act of 1934 to require adequate disclosure of the cost of such credit [extended on margin transactions]. The Committee has been informed in a letter from the SEC that 'the Commission is prepared to adopt its own rules to whatever extent may be necessary.'
>
> "In recommending an exemption for stockbroker margin loans in the bill, the committee intends for the SEC to require

substantially similar disclosure by regulation as soon as it is possible to issue such regulations."

S.Rep. No. 392, 90th Cong., 1st Sess. 9 (1967). The Commission adopted the rule on December 1, 1969. Securities Exchange Act Release No. 8733, 34 F.R. 19717.

The defendants raise three arguments in their motion to dismiss: (1) that there is no private right of action under Rule 10b–16; (2) that Oppenheimer did not "extend credit" to the buyers; (3) that their contracts with the plaintiffs were not "in connection with a securities transaction." The last two arguments depend upon the nature of the transaction between Oppenheimer and the Abeleses.

### A. Private Right of Action.

██ There is no explicit private right of action in Rule 10b–16. In deciding whether to imply one, the court must determine whether Congress intended for there to be one. *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Whether private parties may sue under Rule 10b–16 is unsettled. Two district courts have refused to imply a private right of action. *Furer v. Paine Weber*, [1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,701, at 93,493 (C.D.Ca. April 20, 1982); *Establissement Tomis v. Shearson Hayden Stone*, 459 F.Supp. 1355, 1361 (S.D.N.Y.1978). The United States Court of Appeals for the District of Columbia Circuit and one district court have implied one. *Liang v. Dean Witter & Co.*, 540 F.2d 1107, 1113 n. 25 (D.C.Cir.1976); *Haynes v. Anderson & Strudwick*, 508 F.Supp. 1303 (E.D.Va. 1981).

Neither the *Establissement* nor the *Liang* court discussed the question in detail. In *Establissement*, the court denied a private right of action merely by noting that the plaintiff had "cited no case (and the court is aware of none) holding that a plaintiff may possess a private cause of action for damages under Rule 10b–16." 459 F.Supp. at 1361. The *Liang* court was similarly cursory. It concluded in a foot-

note that there is a private right of action under Rule 10b–16 because it is similar to Rule 10b–5, under which private plaintiffs can sue. 540 F.2d at 1113 n. 25.

The courts in *Furer* and *Haynes* discussed the issue in more detail but reached opposite results. Both focused on the relationship of the Rule to the Truth in Lending Act and noted that the impetus for the promulgation of the Rule was Congress' exemption of securities from the reporting requirements of that statute. Fed.Sec.L. Rep. [1982 Transfer Binder] at 93,495; 508 F.Supp. at 1320. From this the *Haynes* court inferred that Congress must have intended securities dealers to be subject to the same remedies as are in the TILA, which has an explicit private right of action. That court accordingly implied a private right to sue. *Id.* The *Furer* court chose the opposite inference, that Congress may have chosen to require disclosure from dealers by SEC rule rather than the TILA precisely because it did not wish to subject them to private suits. Fed.Sec.L.Rep. [1982 Transfer Binder] at 93,495.

The *Furer* court was correct that the basis for Congress' decision to exempt brokers is, in itself, unclear. It may have intended for brokers to be subject solely to administrative enforcement, or it may have exempted them for some other reason. The legislative history says nothing about enforcement with respect to brokers, and the court is thus left without a determinate guide from the TILA as to whether Congress intended for brokers to be subject to private suits.

The courts' focus on the TILA is not only unproductive; it also seems somewhat misplaced. The language from which the court is asked to imply a private right of action is not in the TILA. It is in a rule promulgated pursuant to an entirely different statute. Congress' intent with respect to that statute is more relevant, and fortunately more discernible, than its intent with respect to the TILA exemption.

Section 10(b) is an anti-fraud provision which Congress intended to have implemented via SEC rulemaking:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78j(b).

The United States Supreme Court has held that "[i]t is now established that a private right of action is implied under § 10(b)." *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). The statute by its own terms is to be implemented by rulemaking, and courts have implied a private right of action under at least one of the rules, Rule 10b–5, promulgated pursuant to the section. *Id.* Rule 10b–5, of course, is a broad anti-fraud provision which closely tracks the language of § 10(b).

Rule 10b–16, like Rule 10b–5, directly advances the purpose of § 10(b). It makes unlawful a *particular* "manipulative or deceptive device"—the extension of credit with undisclosed terms and conditions. In light of the Supreme Court's holding in *Superintendent of Insurance,* it is no longer open to question that Congress intended for there to be a private right of action under § 10(b). Congress designed the statute to be implemented with rules, and Rule 10b–16 is consonant with its purpose. The court concludes, therefore, that a private right of action exists under Rule 10b–16.

**B. *Nature of the Transaction.***

The defendants also base their motion to dismiss on their assertions that Oppenheimer did not "extend credit" to the Abeleses

and that their dealings were not in connection with a securities transaction. If either proposition is true, Rule 10b–16 by its own terms does not apply.

These arguments arise from the parties' fundamental disagreement as to the nature of the transactions which generated this suit. The Abeleses allege that Oppenheimer sold them GNMA certificates and agreed to deliver them at a later date. The defendants maintain that they did not sell the certificates but rather agreed to consummate a sale at a fixed price at a later date.

 If the Abeleses' allegation that they purchased the certificates is true, the defendants extended credit to them in connection with a securities transaction. If the plaintiffs acquired title to the certificates at any time before payment was due, they owned certificates for which Oppenheimer had paid. They would have owed Oppenheimer money, and that is an extension of credit. In addition, any sale of GNMA certificates is in connection with a securities transaction because it *is* a security transaction: GNMA certificates are themselves securities. *Board of Trade v. Securities and Exchange Commission*, 677 F.2d 1137, 1142 (7th Cir.1982).

The court must accept the allegation that the Abeleses purchased the certificates as true for the purposes of a motion to dismiss. *Powe v. City of Chicago*, 664 F.2d at 642. Oppenheimer makes much of their contention that usually GNMA contracts contemplate neither delivery nor transfer of title. The "usual" way in which forwards are traded is not, however, an issue in this case. The Abeleses and Oppenheimer did not trade standardized contracts in a structured environment such as an exchange. These were individually negotiated contracts. The parties now disagree over the meaning of their contracts; but resolution of their factual issue is inappropriate on a motion to dismiss.

IV. *Conclusion.*

For the reasons stated above, the court denies the defendants' motions to dismiss.