**Raymond SLOMIAK, Plaintiff,**

**v.**

**BEAR STEARNS & CO., Defendant.**

**82 Civ. 1542–CSH.**

United States District Court, S.D. New York.

July 24, 1984.

Barry J. Pinkowitz, New York City, for plaintiff; Harold Wm. Suckenik, New York City, of counsel.

Reavis & McGrath, New York City, for defendant; Nathaniel L. Gerber, Carol Zerbe Hurford, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

Plaintiff Raymond Slomiak brings this action pursuant to § 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b), and Rule 10b–16 ("the Rule") promulgated thereunder, 17 C.F.R. § 240.10b–16, to redress alleged violations by defendant Bear, Stearns & Co. ("Bear Stearns") of Rule 10b–16's credit information disclosure provisions. The case is presently before the Court on defendant's motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) and plaintiff's motion for summary judgment. For the reasons stated, both motions are denied.

## I.

*Background*

The events giving rise to this action are not complicated. On May 4, 1977, plaintiff Slomiak opened a margin account with defendant Bear Stearns. On August 1, 1977, he opened a repurchase account with that firm. Each account was introduced to Bear Stearns by MKI Securities Corporation ("MKI"), another securities broker, with Bear Stearns acting in the capacity of clearing broker. (Aronson Aff. ¶ 5). Over the next three years, plaintiff purchased several millions of dollars in government bonds in his margin account, paying less than ten percent of the purchase price in cash. The remainder of the purchase price was loaned to plaintiff by Bear Stearns, initially in his margin account and subsequently in his repurchase account, the account to which the bonds had been transferred. (Slomiak Aff. ¶¶ 2 and 4).

During the years 1977 through 1979, Bear Stearns periodically debited plaintiff's accounts for the interest charged on its loans. In October of 1979, plaintiff was notified by telegram of a margin call on his account. He failed to produce the $155,000 in additional margin requested, and Bear Stearns liquidated the bonds in plaintiff's account with a consequent loss to plaintiff of $256,285. (*Id.* ¶¶ 5–6).

## II.

*Defendant's Motion to Dismiss*

A. *Private Right of Action under Rule 10b–16*

The crux of plaintiff's complaint is that, at the time he opened his margin and repurchase accounts with Bear Stearns, the firm allegedly failed to provide him with a written statement setting forth the terms under which credit would be extended to him, in violation of Section 10(b) of the 1934 Act and Rule 10b–16 promulgated thereunder. Defendant moves to dismiss the complaint on the ground that Rule 10b–16 does not create a private right of action for damages; accordingly, irrespective of the truth or falsity of plaintiff's allegations, his claim must be dismissed as a matter of law.

Rule 10b–16 provides, in pertinent part, as follows:

"(a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer:

"(1) Is given or sent at the time of opening the account, a written statement or statements disclosing (i) the conditions under which an interest charge will be imposed; (ii) the annual rate or rates of

interest that can be imposed; (iii) the method of computing interest; (iv) if rates of interest are subject to change without prior notice, the specific conditions under which they can be changed; (v) the method of determining the debit balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts; (vi) what other charges resulting from the extension of credit, if any, will be made and under what conditions; and (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required."

17 C.F.R. § 240.10b–16.

Only a handful of district courts, and one circuit court, have addressed the question of whether a private right of action may be implied under Rule 10b–16. Most recently, the Court of Appeals for the Second Circuit expressly declined to consider the issue as unnecessary to the particular determination before it. *Zerman v. Ball, Fomon, and E.F. Hutton*, 735 F.2d 15 at 23 (2d Cir.1984), ("In the circumstances, we find it unnecessary to address the question of the existence of a private right of action under ... Rule 10b–16 promulgated under [the 1934] Act."). The question therefore remains an open one in this Circuit.

A useful starting point is a review of the continually evolving judicial formulations of the circumstances giving rise to a private right of action. In recent years, the Supreme Court has pursued an increasingly restrictive approach to implying private remedies. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 374–78, 102 S.Ct. 1825, 1837–39, 72 L.Ed.2d 182 (1982). The relatively liberal inferences endorsed by the Court in *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), wherein the broad remedial purposes of § 14(a) of the Securities Exchange Act were held to give rise to a private right of action for damages, were considerably narrowed a decade later in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45

L.Ed.2d 26 (1975). *Cort* set forth four factors to be considered by a court in determining whether a private right of action is implicit in a given statute. These included legislative intent, consistency of such a remedy with the underlying purposes of the legislative scheme, whether the plaintiff was a member of the class for whose benefit the statute was enacted, and whether the cause of action is one traditionally relegated to state law. *Id.* at 78, 95 S.Ct. at 2087–88. More recently, in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 14, 100 S.Ct. 242, 244, 62 L.Ed.2d 146 (1979), *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979), and *Merrill Lynch, supra*, the Court narrowed the proper mode of analysis even further to a focused inquiry on the question of congressional intent, either implicit or explicit, as evidenced by the language of the statute, the contemporary context of its enactment, its legislative history, and its place in the overall enforcement scheme. *Transamerica, supra*, 444 U.S. at 23–24, 100 S.Ct. at 249.

Several factors make it difficult to discern congressional intent with respect to Rule 10b–16, as the differing analyses of the various courts that have considered the question demonstrate. In *Liang v. Dean Witter & Co., Inc.*, 540 F.2d 1107 (D.C.Cir. 1976), one of the first judicial interpretations of the Rule, the Court of Appeals for the D.C. Circuit had occasion to discuss its evolution in considerable detail. As described in *Liang*, at the time Congress enacted the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, it expressly exempted securities dealers from compliance with TILA, relying on the Securities and Exchange Commission to adopt its own analogous disclosure rule. The Senate Report stated as follows:

"The Committee has been informed by the Securities and Exchange Commission that the Commission has adequate regulatory authority under the Securities Exchange Act of 1934 to require adequate disclosure of the costs of such credit. The Committee has also been informed in a letter from the SEC that 'the Commis-

sion is prepared to adopt its own rules to whatever extent may be necessary.'

"In recommending an exemption for stockbroker margin loans in the bill, the Committee intends for the SEC to require substantially, similar disclosure by regulation as soon as it is possible to issue such regulation."

S.Rep. No. 392, 90th Cong., 1st Sess. 9 (1967).

As stated by Judge Wilkey in *Liang, supra:*

> "Rule 10b–16 represents the SEC implementation of the instruction from Congress .... The SEC authority for the Rule is derived, of course, from the prohibition in Section 10(b) of the Securities Exchange Act of 1934 against the use of 'any manipulative or deceptive device' in connection with the purchase or sale of any security. Tracking the express purpose of the Truth in Lending Act, the SEC announced the disclosure sought by Rule 10b–16 as follows:
>
>> " 'The initial disclosure is designed to insure that the investor, before his account is opened, understands the terms and conditions under which credit charges will be made. This will enable him to compare the various credit terms available to him and to understand the methods used in computing the actual credit charges.' " SEC Release No. 8733, 34 F.R. 19717.

*Liang, supra,* 540 F.2d at 1111.

With respect to the narrow question presently before this Court—i.e., the implication of a private right of action under the Rule—the circuit court observed in a footnote:

> "It may safely be assumed that noncompliance with Rule 10b–16 provides the basis for a private cause of action. It is already established that a violation of Rule 10b–5, a rule of disclosure analogous to Rule 10b–16, implies a civil remedy. *Supt. of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9 [92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128] (1971). Our recognition here accords with the view that 'private enforcement of Commission rules may "[provide] a necessary supplement to Commission action." ' *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730 [95 S.Ct. 1917, 1923, 44 L.Ed.2d 539] (1975), *quoting J.I. Case Co. v. Borak,* 377 U.S. 426, 432 [84 S.Ct. 1555, 1560, 12 L.Ed.2d 423] (1964)." *Liang, supra,* 540 F.2d at 1113 n. 25.

In a similarly cursory, but contrary, holding, one district court in this Circuit dismissed a Rule 10b–16 claim on the ground that plaintiff had "cited no case (and the court is aware of none) holding that a plaintiff may possess a private right of action for damages under Rule 10b–16." *Establissement Tomis v. Shearson Hayden Stone,* 459 F.Supp. 1355 (S.D.N.Y.1978). Whether the *Tomis* court would have ruled differently if its attention had been directed to footnote 25 of the *Liang* opinion is open to speculation. In any event, more useful are two cases that have addressed in some depth the question of a private damages remedy under the Rule. It is these two cases that, in large measure, animate the parties' dispute here.

In *Haynes v. Anderson & Strudwick, Inc.,* 508 F.Supp. 1303 (D.Va.1981), the district court's application of the factors set forth in *Cort v. Ash, supra,* led it to conclude, by a somewhat circuitous route, that Congress intended for Rule 10b–16 to afford individual plaintiffs a private right of action. More specifically, the court reasoned that Congress's creation of an express private remedy under TILA "weighs heavily in favor of an implied cause of action for noncompliance with Rule 10b–16. Indeed, the denial of a remedy under the Rule would be inconsistent with the express intent of Congress that customers have a remedy for noncompliance with an analogous statute." *Id.* at 1320. The *Haynes* court went on to observe that because the underlying objectives of TILA and Rule 10b–16 are the same—"that is, customers should be informed about the terms and conditions of the extension of credit"—the Act and the Rule should be read in harmony. *Id.*

This line of argument is not, in my view, particularly persuasive. Congruity of purpose between TILA and Rule 10b–16 does not mandate identical enforcement mechanisms. Accordingly, Congress's direction that the SEC adopt a rule requiring disclosure "substantially similar" to that required under TILA does not conclusively demonstrate its intent that compliance be achieved through private action versus agency enforcement.

The court in *Furer v. Paine, Webber*, (CCH) Fed.Sec.L.Rep. 93,493, ¶ 98,701 (C.D. Cal.1982), also looked to the legislative history of the Truth in Lending Act for guidance in construing Rule 10b–16. While its approach was similar to that of the *Haynes* court, its conclusion was not. The *Furer* court found equally plausible the notion that Congress exempted brokers from TILA "because it did not wish to extend the private right of action extended therein to apply to brokers." *Id.* at 93,495. The court went on to note that:

> "Congress chose to leave promulgation and enforcement of analogous regulations to the SEC, and the SEC has seen fit to rely on its own enforcement resources, rather than enlisting private enforcement by creating an express private right of action. Congress's inaction in this area is, therefore, subject to conflicting interpretations.

> "In light of the ambiguity of the legislative history of the Truth in Lending Act, the Court holds that a private right of action is not available under Rule 10b–16. The creation of such a private remedy would open a potentially large new area for litigation. In the absence of a clear and unambiguous showing that Congress intended such a result, the Court declines to find a private right of action implied in the Rule."

*Id.*

The difficulty in accepting either the *Furer* or the *Haynes* court's analysis of Rule 10b–16 results from their effort to discern congressional intent derivatively; that is, by extrapolation from an analogous, but otherwise unrelated, statute.

Generally, of course, the question of private remedies focuses on a particular statute rather than a rule promulgated pursuant to a statute, *see, e.g., Touche Ross, supra* (Section 17(a) of the Securities Exchange Act); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Section 14(e) of the Securities Exchange Act); *Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216 (4th Cir. 1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981) (Section 13 of the Securities Exchange Act); *Leff v. CIP Corp.*, 540 F.Supp. 857, 864 (S.D.Ohio 1982) (Sections 13(d) and 14(a) of the Securities Exchange Act), and the inquiry into congressional intent proceeds by a review of the various House and Senate reports that comprise that statute's legislative history. The situation necessarily becomes more complicated where, as here, the parties are contesting the availability of a private remedy under an agency regulation that, strictly speaking, has no independent legislative history from which to construe congressional intent. In this situation, the mode of analysis suggested in *Transamerica, supra*, is not directly applicable.

The inconsistent judicial interpretations of Rule 10b–16 are the product, I would suggest, of various courts' efforts to extract from the legislative history of TILA some indication of Congress's intent with respect to a rule promulgated pursuant to an entirely different statute. Congress's remarks at the time of TILA's enactment clearly demonstrate its intent that the SEC draft a similar credit disclosure rule applicable to brokers. But the only indication of congressional intent pertinent to the narrow question of a private right of action under 10b–16 comes, in my view, from the Senate committee's acknowledgment that the SEC had adequate rulemaking authority to require such disclosure under the anti-fraud provisions of the Securities Exchange Act of 1934—i.e., under Section 10(b) of the Act. S.Rep. No. 392, 90th Cong., 1st Sess. 9 (1967). It was amply clear then, as it is now, that a private right of action is available under § 10(b), as well as Rule 10b–5 of the 1934 Act. *See Her-*

man & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683 n. 10, 74 L.Ed.2d 548 (1983) ("By 1961, four courts of appeals and several district courts in other circuits had recognized the existence of a private remedy under Section 10(b) and Rule 10b–5 .... By 1969, the existence of a private cause of action had been recognized by ten of the eleven courts of appeals."); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975); *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971) ("It is now established that a private right of action is implied under § 10(b)."). Thus, to the extent Congress's intentions or expectations may be gleaned from its directive to the SEC to exercise its rulemaking authority pursuant to § 10(b) of the 1934 Act, it is logical to presume that Congress intended such a rule to accord a private remedy consistent with the statute authorizing it.

This, in substance, is the conclusion recently reached by another district court in *Abeles v. Oppenheimer,* 597 F.Supp. 532, No. 83–1468 (N.D.Ill. Nov. 7, 1983). The *Abeles* court rejected as both unproductive and misplaced past judicial interpretations of Rule 10b–16 that resolved the private remedy question by reference to TILA's legislative history rather than by reference to Congress's intent with respect to Section 10(b), the relevant implementing statute. Noting that the drafters of § 10(b) explicitly contemplated implementation by rulemaking, the court went on to observe as follows:

"Rule 10b–16, like Rule 10b–5, directly advances the purpose of § 10(b). It makes unlawful a particular 'manipulative or deceptive device'—the extension of credit with undisclosed terms and conditions. In light of the Supreme Court's holding in *Superintendent of Insurance,* it is no longer open to question that Congress intended for there to be a private right of action under § 10(b). Congress designed the statute to be implemented with rules, and Rule 10b–16 is consonant with its purpose. The court

concludes, therefore, that a private right of action exists under Rule 10b–16."
*Abeles,* 597 F.Supp. at 536.

I concur in this conclusion. Defendant's motion to dismiss plaintiff's Rule 10b–16 claim is denied.

### B. *Section 29(b) of the 1934 Act*

In addition to the actual losses suffered in connection with the liquidation of his bonds, plaintiff seeks rescission of his bond transactions pursuant to § 29(b) of the 1934 Act, 15 U.S.C. § 78cc. That section provides, in pertinent part, as follows:

"Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract ... heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void...."

While the proper construction of § 29(b)'s extremely broad language has been the subject of both judicial and scholarly debate, *see generally* Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened,* 48 Geo.Wash.L.Rev. 1 (1979), I agree with defendant that the remedy of rescission is not available to plaintiff here. The complaint alleges that Bear Stearns failed to send plaintiff a written credit disclosure statement in violation of Rule 10b–16 at the time he opened his accounts; it does not allege that the customer agreements establishing his margin and repurchase accounts at Bear Stearns were themselves unlawful. In a factually similar case, *Zerman v. Jacobs,* 510 F.Supp. 132 (S.D.N.Y.1981), *aff'd,* 672 F.2d 901 (2d Cir. 1981), Judge Weinfeld rejected the remedy plaintiff now seeks. The dispute in *Zerman* arose, as here, out of the liquidation of plaintiff's margin securities account after plaintiff's purported failure to respond to a margin call. Plaintiff, alleging that defendant had improperly refused to accept

the securities tendered in satisfaction of the call, sought, *inter alia*, rescission of all securities transactions engaged in by defendant to liquidate his account. Noting that "[t]here is no suggestion that the basic customer agreement plaintiff signed is not lawful," *id.* at 135, Judge Weinfeld rejected plaintiff's argument on the ground that "under § 29(b) of the Exchange Act, only unlawful *contracts* may be rescinded, not unlawful *transactions* made pursuant to lawful contracts." *Id. See also Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 474 F.Supp. 286, 291 (D.Conn.1979) (rejecting plaintiff's argument that "Section 29(b) should not only apply to the basic contract between the parties but also to each transaction that occurs thereunder.").

In *Drasner v. Thomson McKinnon Securities,* 433 F.Supp. 485 (S.D.N.Y.1977), Judge Pollack construed § 29(b) as "render[ing] void those contracts which by their terms violate the Act or the rules and regulations thereunder..., for it is only such contracts which are made 'in violation of,' or 'the performance of which involves the violation of' the statute and the rules and regulations thereunder." *Id.* at 501–02. While plaintiff Slomiak challenges Judge Pollack's conclusion as contrary to the plain language of § 29(b), and views as unsupportable the distinction between an "unlawful contract" and an "unlawful transaction," I think the distinction is a reasonable one if § 29(b) is viewed as a remedy for contracts which in their inception or as performed are, or become, *inherently* violative of the Act or regulations thereunder. Judge Pollack's focus on contracts which "by their terms" are illegal may fairly be interpreted more broadly to foreclose the remedy of rescission where, as here, the violation complained of is collateral or tangential to the contract between the parties. As stated by Judge Friendly in his dissenting opinion in *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir.1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971):

"Despite the Draconian language, § 29(b) does not provide a pat legislative formula for solving every case in which a contract and a violation concur. Rather it was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction."

*Id.* at 1149.

This reading of § 29(b) is consistent with the Fifth Circuit's opinion in *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.,* 678 F.2d 552 (5th Cir.1982), wherein the court interpreted Section 29(b) as "render[ing] voidable those contracts that are either illegal when made or as in fact performed...." *Id.* at 560. The illegality involved in *Regional,* unlike the violation alleged here, was inseparable from the performance of the contract plaintiff was seeking to rescind. Indeed, the act of performance constituted the violation: defendant had never registered as a broker-dealer with the SEC and, by carrying out its obligations under the contract, violated section 15(a)(1) of the Securities Exchange Act. While the contract did not "by its own terms," or *in vacuo,* violate the Act, there could be no performance under the contract without violating the Act. *See also Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357 (5th Cir.), *cert. denied,* 393 U.S. 913, 89 S.Ct. 234, 21 L.Ed.2d 198 (1968).

In the instant action, plaintiff contends that defendant failed to send a written disclosure statement to him at the time he opened his accounts, thereby violating the rule requiring securities dealers who plan to extent credit to customers to have established procedures to assure that such disclosure is made in a timely fashion. In other words, defendant failed to comply with an obligation that, by the terms of Rule 10b–16, arises at the time a margin or repurchase account is opened but which is clearly collateral to the contractual agreement governing that account. The fact that the timing of disclosure under Rule 10b–16 is keyed to the opening of a margin account, so that failure to have provided the required written statement at that time

automatically triggers a violation of the Rule, does not justify rescission of the account agreement itself or transactions undertaken pursuant to that agreement. This is not, in my view, the kind of circumstance Section 29(b) is intended to redress. Accordingly, to the extent plaintiff seeks rescission of his bond transactions pursuant to § 29(b), his request is denied.

## D. *Elements of a Rule 10b–16 Claim*

■ Defendant also moves to dismiss the complaint on the ground that plaintiff has failed adequately to allege in his amended complaint the elements requisite to a § 10(b) and Rule 10b–16 cause of action. While plaintiff's complaint is by no means detailed, it does not suffer from the fatal deficiencies defendant suggests. The claim is a simple one and plaintiff's allegations, rather than "conclusory," are comparably spare. Paragraph 13 of the amended complaint states as follows:

> "13. The failure of Bear Stearns to send plaintiff the written credit disclosure statement required by Rule 10b–16 was intentional and/or reckless. The information required to be disclosed to plaintiff pursuant to Rule 10b–16 was material to plaintiff's investment decision."

The complaint further alleges that, by virtue of defendant's failure to disclose credit information pertinent to plaintiff's investment decision, plaintiff has been damaged. (Comp. ¶ 14).

The crux of defendant's argument appears to be that plaintiff has not sufficiently alleged the elements of reliance and causation—i.e., that he "would not have acted as [he] did had [he] known of the information withheld by defendants," *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath,* 516 F.2d 811, 814 (2d Cir.1975), and that defendant's failure to disclose said information caused his injury. A logical and necessary distinction has been made between § 10(b) claims alleging affirmative misrepresentations and those alleging nondisclosure, as in the instant action. In the case of an omission, the usual bifurcated inquiry—(1) Did plaintiff believe what defendant said?; and (2) Did that belief cause plaintiff to act?—obviously is inapplicable, and the question is more appropriately phrased as one of materiality. As stated by the Supreme Court in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972): "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.... This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." *Id.* at 153–54, 92 S.Ct. at 1472. *See Pellman v. Cinerama,* 89 F.R.D. 386, 387 (S.D.N.Y. 1981) ("To establish causation under section 10(b) ..., a plaintiff must prove that an omission was material; he need not prove that he relied upon the absence of the information in making his decision."). Further, plaintiff is not required to prove that the defendant's act was the exclusive cause of his injury, but rather that it was a "significant contributing cause." *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981), *quoting Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27, 34 (2d Cir.1976).

With these standards, I find the allegations of the complaint sufficient to set forth a cause of action pursuant to § 10(b) and Rule 10b–16, as well as sufficiently specific to apprise defendant of the exact nature of the violation alleged, i.e., failure to disclose the specific information delineated in Rule 10b–16. *See Angelastro v. Prudential-Bache Securities, Inc.,* 575 F.Supp. 270, 274–75 (D.N.J.1983).

## III.

### *Plaintiff's Motion for Summary Judgment*

■ Plaintiff moves for summary judgment pursuant to Fed.R.Civ.P. 56(a) on the ground that while he has "unequivocally stated that he did not receive" the written credit disclosure statement mandated by Rule 10b–16 (Pl.Br. at 11), defendant has produced no credible or relevant evidence

to demonstrate its compliance with the Rule. I cannot agree.

In opposition to plaintiff's motion for summary judgment, Bear Stearns has submitted to the Court affidavits by two individuals familiar with the procedures employed by defendant in 1977 to ensure adequate disclosure under the securities laws. As set forth in the affidavit of Raymond Aronson, Associate Director of Bear Stearns' Legal and Compliance Department, Bear Stearns followed certain established procedures in 1977 to ensure that any customer to whom it extended credit would be given or sent written disclosure of the following:

> "the conditions under which interest charges would be made; the annual rates of interest that would be charged; the method whereby interest rates would be computed; the circumstances under which interest rates could be changed without prior notice to the customer; the method of determining the debit balance or balances on which interest would be charged and whether credit would be given for credit balances in a customer's cash account; other charges, if any, resulting from the extension of credit which would be made and the conditions under which they would be made; and the nature of any interest or lien retained by Bear Stearns in the security or other property held as collateral and conditions under which additional collateral could be required."

(*Id.* ¶ 6).

The information described above, which tracks the language of Rule 10b–16, was contained in printed forms entitled "Statement of Interest Charges Pursuant to The 'Truth in Lending' Rule." Preparation of these forms was one aspect of Bear Stearns' compliance procedure. (*Id.* ¶ 7). When Bear Stearns was acting in the capacity of a clearing broker, as it was in this instance, it would evaluate the adequacy of the procedures established by the broker-dealer who introduced the account to ensure that customers received "all the documentation required by applicable laws and

regulations." (*Id.* ¶ 10). If the evaluation was favorable, as it was in the case of MKI (*Id.* ¶ 10), Bear Stearns would provide the broker-dealer with its Truth in Lending Form to pass on to the customer. Alternatively, Bear Stearns would send the form directly to the customer. (*Id.* ¶ 8). As described by David Curtis, the Treasurer and Operations Manager of MKI, pursuant to an agreement entered into by defendant and MKI in 1975,

> "[d]ocuments relating to customer accounts would be prepared by Bear Stearns and furnished to MKI, MKI in turn would furnish the appropriate documentation to the customers. Among the documents furnished to customers pursuant to this procedure were a customer agreement (for signature and return), a declaration of nonresidence (for signature and return), a 'Statement of Interest Charges Pursuant to The Truth in Lending Rule ("TIL Form")', and a repurchase agreement (for signature and return)."

(Curtis Aff. ¶ 3).

Plaintiff argues that "the only document introduced by defendant in its answering papers [the TIL Form] ... is wholly irrelevant to plaintiff's account and irrelevant as evidence in this case." (Pl. Reply Br. at 1). While the TIL form would appear to be entirely relevant to the margin account first opened by plaintiff, it is apparently not pertinent to the extension of credit in plaintiff's repurchase account. The fact that defendant has not submitted more relevant documents at this juncture, although certainly troubling, is not dispositive of the issue of defendant's compliance. Both the Curtis and Aronson affidavits indicate that the TIL form was merely part of the documentation sent to customers in conformity with procedures established to ensure "customers would receive all the documentation required by applicable laws and regulations." (Aronson Aff. ¶ 10; Curtis Aff. ¶ 3). Aronson's deposition testimony further indicates that specific information regarding repurchase accounts was sent to customers who would be engaging in re-

purchase transactions (Aronson Dep. at 23, 29–34, 39–40).

I also do not find the testimony of David Braver, MKI's executive vice-president, regarding his oral advice to customers, "a clear admission" that Bear Stearns had no procedure in place to provide customers engaging in repurchase transactions with the written credit disclosures required under the Rule. Notably, of course, Mr. Braver is not an employee of Bear Stearns, and, as he stated repeatedly, he does not know what documents were furnished by Bear Stearns or MKI to customers. The following excerpts from his deposition testimony, filed in a related action, *Torn v. Rosen*, No. 82–3130, are illustrative:

"Q. And if a customer did not ask about the interest rate, which he would be paying—would he be advised by Bear Stearns and MKI?

"A. On a monthly basis, yes, on the statement.

"Q. Would he be advised in any other written document other than the monthly statement?

"A. I don't know."

(Braver Dep. at 35).

"Q. Mr. Braver, you testified that you discussed the applicable margin requirements in your conversation with Mr. Rosen.

"Did you personally send him any written document setting forth the margin requirements which you had described to him?

"A. No.

"Q. To the best of your knowledge, did either MKI or Bear Stearns send Mr. Rosen such a document?

"A. I don't know."

(Braver Dep. at 37).

Bearing in mind this Circuit's caution that, in the context of a motion for summary judgment, the "burden ... is on the moving party to establish that no relevant facts are in dispute," *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980); *see also Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319 (2d Cir.1975), as well as

this Court's obligation to "resolve any doubts in favor of the party opposing the motion," *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978), I must conclude that defendant has generated uncertainty as to material, triable issues of fact: whether or not Bear Stearns had adequate Rule 10b–16 compliance procedures in place in 1977, and whether or not plaintiff was sent documentation sufficient to satisfy the Rule. While a litigant opposing summary judgment "may not rest upon mere conclusory allegations or denials," *S.E.C. v. Research Automation Corp., supra*, 585 F.2d at 33, it is sufficient if he brings to the court's attention, by way of affidavit or other material, "some affirmative indication that his version of relevant events is not fanciful." *Quinn, supra*, 613 F.2d at 445. In my view, the Curtis and Aronson affidavits and their deposition testimony provide the requisite "affirmative indication" to render summary judgment inappropriate. Evidence of the routine practice of an organization, whether corroborated or not, is relevant to prove that the organization's conduct on a particular decision conformed to its practice. Rule 406, F.R.Evid.

Further, even assuming plaintiff did not receive the written credit disclosure statement required under the Rule, a factual issue remains as to whether this omission was a result of intentional or reckless conduct on the part of Bear Stearns. This latter inquiry is mandated by the fact that, as plaintiff concedes, a "Section 10(b) plaintiff carries a heavier burden than [plaintiffs alleging other securities violations]. Most significantly, he must prove that the defendant acted with scienter, *i.e.*, with intent to deceive, manipulate, or default." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 692, 74 L.Ed.2d 548 (1983). While this Circuit has consistently held that "proof of reckless conduct meets the requirement of scienter in a section 10(b) claim," *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566 (2d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *see also IIT v. Cornfeld*, 619 F.2d

**686**

909, 923 (2d Cir.1980), negligent conduct alone is insufficient to ground a § 10(b) cause of action. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976); *Chemical Bank v. Arthur Andersen & Co.*, 552 F.Supp. 439, 455 (S.D.N.Y.1982). Given the extremely limited discovery in this action to date, the question of intent remains to be explored.

Plaintiff's attempt to circumvent the necessity for further inquiry into the issue of scienter by the conclusory assertion that "recklessness ... is to be presumed from the very failure to make the disclosure" is entirely unpersuasive. As defendant properly observes, such a suggestion is tantamount to the imposition of a strict liability standard for any deviation from Rule 10b–16's disclosure requirements, a result that would render meaningless the well-established scienter requirement in § 10(b) actions.

*Conclusion*

For the reasons stated, defendant's motion to dismiss the complaint is denied, except insofar as it seeks dismissal of plaintiff's request for relief pursuant to Section 29(b) of the 1934 Act. Plaintiff's motion for summary judgment is denied.

Counsel for both parties are directed to comply with the provisions of the pre-trial scheduling order accompanying this opinion.

It is SO ORDERED.