764 F.2d 939
 54 USLW 2007, Fed. Sec. L. Rep. P 92,076
 Laura ANGELASTRO, on behalf of herself and all others
similarly situated, Appellant in 84-5427,
v.
PRUDENTIAL-BACHE SECURITIES, INC. and Bache Halsey Stuart
Shields, Inc., Appellants in 84-5401.
 Nos. 84-5401, 84-5427.
 United States Court of Appeals, Third Circuit.
 Argued Feb. 26, 1985.
Decided June 12, 1985.
 
 Richard D. Greenfield, Robert P. Frutkin, Susan Schneider Thomas (argued), Greenfield, Chimicles & Lewis, Haverford, Pa., for appellant in No. 84-5427.
 Leonard Barrack, Daniel E. Bacine (argued), Samuel R. Simon, Barrack, Rodos & Bacine, Philadelphia, Pa., for appellants in No. 84-5401.
 Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, David A. Sirignano (argued), Asst. Gen. Counsel, Gerard S. Citera, Gordon K. Fuller, Washington, D.C., for S.E.C., Amicus Curiae; Paul Gonson, Sol., of counsel.
 Before ADAMS, WEIS and WISDOM,* Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This appeal presents the issue whether alleged misrepresentations and nondisclosures by a brokerage firm regarding the credit terms of a margin account fall within the ambit of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982) (Exchange Act), and two rules promulgated thereunder by the Securities and Exchange Commission (SEC). The district court concluded that even if proved such deceptive practices could not be deemed "in connection with" the purchase or sale of a security, and dismissed plaintiff's claims under section 10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1984); it did determine, however, that plaintiff could institute a private action under Rule 10b-16, 17 C.F.R. Sec. 240.10b-16 (1984). We agree that a private action may be brought under Rule 10b-16, and therefore will affirm the district court's ruling on that issue. However, because we conclude that misrepresentations and nondisclosures regarding a margin account may be "in connection with" the purchase or sale of a security, we will reverse the order dismissing the section 10(b) and Rule 10b-5 claims.
 
 I.
 
 2
 Laura Angelastro, the plaintiff, maintained a margin account with Bache Halsey Stuart Shields, Inc., a national securities brokerage firm. On April 4, 1983, Angelastro filed suit in district court on behalf of herself and all others who purchased securities from 1977-82[1] through margin accounts maintained by defendant Prudential-Bache Securities, Inc., or its corporate predecessor, Bache Halsey Stuart Shield, Inc.[2] The complaint asserted that Bache misrepresented and failed to disclose material information regarding the interest rates applicable to its margin accounts, purportedly in violation of section 10(b) of the Exchange Act and Rules 10b-5 and 10b-16.
 
 
 3
 Defendants moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief could be granted. Holding that the activities alleged in the complaint were not undertaken "in connection with" the purchase or sale of any securities, the district court dismissed Angelastro's Rule 10b-5 claim. Angelastro v. Prudential-Bache Securities, Inc., 575 F.Supp. 270 (D.N.J.1983). The court rejected, however, defendants' argument that no private right of action exists under Rule 10b-16, and held that the complaint did state a claim under that rule.
 
 
 4
 The district court certified its decisions on both Rules 10b-5 and 10b-16 for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) (1982). In June of 1984, we granted the parties' motions for certification. This interlocutory appeal is limited to two issues: (1) whether alleged fraud regarding the credit terms of a margin account may be "in connection with" the purchase and sale of securities within the meaning of section 10(b) of the Exchange Act and the Commission rules promulgated thereunder; and (2) whether a private right of action exists under Rule 10b-16.
 
 II.
 
 5
 Section 10(b)[3] and Rule 10b-5,[4] the basic anti-fraud provision promulgated thereunder, interdict the misrepresentation or omission of material facts in connection with the purchase or sale of any securities. A Rule 10b-5 claim requires, inter alia, that the misrepresentation be made "in connection with" the purchase or sale of a security. See Ketchum v. Green, 557 F.2d 1022, 1025 (3d Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977).[5] The purpose underlying section 10(b) and the rules adopted under it is to insure that investors obtain disclosure of material facts in connection with their investment decisions regarding the purchase or sale of securities. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). Rule 10b-5 claims typically involve alleged misrepresentations with respect to the merits of a particular security. For example, nondisclosure of insider information concerning the value of securities states a claim under the rule. See, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228 (2d Cir.1974); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir.1968) (in banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Such a misrepresentation is obviously made "in connection with" the stock that is subsequently sold or purchased.
 
 
 6
 Rule 10b-5 also encompasses misrepresentations beyond those implicating the investment value of a particular security. The Supreme Court has declared that section 10(b) must be read "flexibly, not technically and restrictively." Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). In Bankers Life, the Supreme Court permitted a section 10(b) claim to proceed in an action concerning the misappropriation of bond sale proceeds to cover "rubber" checks previously used to purchase securities. 404 U.S. at 6, 92 S.Ct. at 165. In the course of its discussion, the Supreme Court interpreted the "in connection with" language of section 10(b) to require that the plaintiff has "suffered an injury as a result of deceptive practices touching [the purchase or] sale of securities." Id. at 12-13, 92 S.Ct. at 169-70. This Court has construed the "touching" requirement as mandating that there be some "causal connection between the alleged fraud and the purchase or sale" of a security. Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 194 (3d Cir.1976); see also Ketchum v. Green, 557 F.2d at 1028; Liberty National Insurance Holding Co. v. Charter Co., 734 F.2d 545, 555 (11th Cir.1984) (noting that the "in connection with" element requires a causal relationship between the claimed deception and a subsequent purchase or sale).
 
 
 7
 In keeping with the Supreme Court's statement that the "in connection with" language be read broadly, many courts have found the requisite causal nexus in situations involving the course of dealing in securities. Cf. Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485, 494 (S.D.N.Y.1984) (fraud directly related to the trading process meets the "in connection with" requirement); A.T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir.1967) ("a 10b-5 action will survive even though the fraudulent scheme or device is unrelated to 'investment value' "). For example, many courts have found the allegations of churning[6] state a claim under Rule 10b-5. See, e.g., Costello v. Oppenheimer & Co., 711 F.2d 1361, 1368 (7th Cir.1983); Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413 (11th Cir.1983); In re Catanella and E.F. Hutton and Co., 583 F.Supp. 1388, 1405, 1410-11 (E.D.Pa.1984). The fraud present in a churning operation does not concern the merits of the individual securities bought and sold but rather the excessiveness of the number of transactions in the aggregate.
 
 
 8
 Similarly, several courts have found a broker's failure to explain the risks of trading on margin to be actionable under Rule 10b-5. For example, in Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 619 (9th Cir.1981), the Ninth Circuit rejected the defendant's argument that fraud "in connection with the method of financing the purchases of securities, not with the purchase itself" fell outside the coverage of Rule 10b-5. The court held that misrepresentation of the risks of buying securities on margin in a declining market may be considered fraud "in connection with" the purchase of securities." Id.; see also Catanella, 583 F.Supp. at 1413; Yancoski v. E.F. Hutton & Co., 581 F.Supp. 88, 92 (E.D.Pa.1983). Many other types of fraud involving the trading process, rather than the investment value of a particular security have also been found to come within the scope of section 10(b) and Rule 10b-5. See, e.g., McGrath v. Zenith Radio Corp., 651 F.2d 458 (7th Cir.) (inducement to tender stocks by false promise of future employment), cert. denied, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981); Marbury Management, Inc. v. Kohn, 629 F.2d 705 (2d Cir.) (misrepresentation that broker-trainee was stockbroker and portfolio management specialist), cert. denied, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980).
 
 
 9
 In Steinberg v. Shearson Hayden Stone, Inc., 546 F.Supp. 699 (D.Del.1982), the court was confronted with precisely the question at issue here. There the court held that a claim of failure to disclose material facts regarding credit terms of a margin account is actionable under Rule 10b-5. Although not discussed explicitly, the court necessarily found misrepresentations of the credit terms of a margin account to be "in connection with" the purchase or sale of a security. See also Establissement Tomis v. Shearson Hayden Stone, Inc., 459 F.Supp. 1355, 1361-63 (S.D.N.Y.1978) (suggesting that a 10b-5 action can be maintained for various margin violations).
 
 
 10
 As noted, this Court has construed the "in connection with" language as requiring some causal connection between the alleged misrepresentation and the harm incurred when a security is purchased or sold. Ketchum v. Green, 557 F.2d 1022, 1028 (3d Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977); Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 194 (3d Cir.1976). In Paragraph 16 of her complaint, Angelastro asserted that defendants failed to disclose fully and accurately to their margin customers material information such as (1) "the specific interest rate that would be charged in connection with each such purchase"; (2) "the formula pursuant to which interest charges were assessed"; (3) "that all amounts credited to their customers' accounts would not be considered in computing daily interest charges to be assessed against those margin accounts"; (4) "that increases in the market value of the underlying securities in connection with which credit was extended by Bache would not be considered in determining the extent of credit or in computing interest charges to be assessed against their customers' margin accounts"; and (5) "that the interest rates available to its customers who maintained margin accounts were variable, the factors upon which the variable rates were determined and the procedures by which its customers could obtain a variable interest rate." Plaintiff further avers that these misrepresentations induced her "to purchase various securities through Bache" in margin accounts. Complaint paragraphs 15, 17.
 
 
 11
 For purposes of a Fed.R.Civ.P. 12b(6) motion to dismiss for failure to state a claim upon which relief can be granted, we must accept all well pleaded allegations in the complaint as true and view them in the light most favorable to plaintiff. Rogin v. Bensalem Township, 616 F.2d 680, 685 (3d Cir.1980), cert. denied, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 444 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). We may not dismiss the complaint unless the plaintiff can prove no set of facts which would entitle her to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957); accord Bogosian, 561 F.2d at 444.
 
 
 12
 Like churning, concealment or misrepresentation of interest terms relating to a margin account does not affect the investment value of a particular security, but rather the course of dealing in securities. Accordingly, under the standard announced in Tully and Ketchum, Angelastro has pleaded a sufficient causal connection between the purported fraudulent concealment and her purchases of securities on margin to meet the "in connection with" requirement of section 10(b) of the Exchange Act. See Jaksich, 582 F.Supp. at 494. The Supreme Court has emphasized that the federal securities laws were designed " 'to achieve a high standard of business ethics ... in every facet of the securities industry.' " United States v. Naftalin, 441 U.S. 768, 775, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979) (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186-87, 84 S.Ct. 275, 279-81, 11 L.Ed.2d 237 (1963)) (emphasis added in Naftalin ). Holding that the concealment of credit terms of a margin account falls within the purview of Rule 10b-5 comports with this policy. Accord Steinberg, 456 F.Supp. at 700-01.
 
 
 13
 Investors maintain margin accounts with brokerage firms for the very purpose of trading in securities.[7] They need accurate information regarding the credit terms of their margin accounts in order that they may evaluate the desirability of purchasing securities on margin. The amount required to service the debt in a margin account may very well affect the profitability of such trading. Moreover, disclosure of the rate and method of calculation of interest payments is also critical in order that an investor will not become overextended, and then be forced to liquidate, possibly at substantial losses, all or part of his or her margin holdings to meet a margin call. We therefore reject Bache's assertion that, as a matter of law, plaintiff could prove no set of facts to demonstrate a connection between the credit terms of a margin account and her decision to purchase securities on margin. If Angelastro can establish what she sets forth in her complaint--that defendants' misstatements and nondisclosure of material terms induced her to purchase certain securities to her financial detriment--she may very well be entitled to some recovery.[8]
 
 
 14
 One basis for the district court's rejection of plaintiff's Rule 10b-5 claim was a concern that if "brokerage firms were liable under 10b-5 for margin violations, it would logically follow that other lending institutions which made credit available for use in stock market transactions could also be liable under 10b-5 on their misrepresentations." 575 F.Supp. at 273. We agree that there is a danger in construing the "in connection with" requirement so broadly that virtually any type of misconduct related to a securities transaction even in the most tenuous or tangential way might be claimed to give rise to a federal securities law violation. The Supreme Court was aware of potential overextensions of section 10 when it established the scope of the "in connection with" requirement in Bankers Life. It observed that Congress "did not seek to regulate transactions which constitute no more than internal corporate mismanagement." 404 U.S. at 12, 92 S.Ct. at 169. To avoid the pitfalls of such overreaching, we noted in Ketchum, 557 F.2d at 1027, that courts should adopt a case-by-case approach for determining the proper scope of the "in connection with" requirement. Id.; see also Smallwood v. Pearl Brewing Co., 489 F.2d 579, 595 (5th Cir.), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).
 
 
 15
 Thus the in terrorem argument advanced by defendants and accepted by the district court is not persuasive. Our holding that the misrepresentations alleged by Angelastro regarding her margin account are cognizable under Rule 10b-5 does not mean that every loan transaction in which a pledge[9] of securities is involved or every bank loan for the purpose of purchasing securities is necessarily within the purview of section 10(b). We decide only the issue certified to us by the district court.[10]
 
 
 16
 Accordingly, defendants' reliance on the Second Circuit's decision in Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), is not well founded. In that case, Frigitemp Corporation arranged a bank loan for Elsters Corporation, its subsidiary. As part of the loan agreement, Frigitemp guaranteed Elsters' promissory note and pledged as security 100% of the subsidiary's stock. After Frigitemp filed a bankruptcy petition, the lending banks instituted a Rule 10b-5 action against Frigitemp's accountant. The banks alleged that they had relied on falsified accounting statements when they decided to make the loan. Because the pledge of Elsters' stock was found to be totally unrelated to the allegedly false financial statements of Frigitemp, the Second Circuit held that the misrepresentations were not made in connection with the pledge of Elsters' stock. 726 F.2d at 944-45. There was no allegation of fraud regarding the stock, and the pledge was "merely an incident in a transaction not otherwise involving the purchase or sale of securities." Id. at 944 n. 24.
 
 
 17
 The Second Circuit was concerned that every bank loan partially secured by the pledge of stock might fall within the scope of section 10(b). We also agree that too broad an interpretation of Sec. 10(b) is unwarranted, but our decision here is not inconsistent with Chemical Bank. Misrepresentation of the credit terms of a margin account, which is what purportedly occurred here, is a different situation from that in Chemical Bank, and clearly meets the "in connection with" requirements.
 
 
 18
 Finally, we note that affirming the district court's decision regarding Rule 10b-5 would cast doubt upon the validity of Rule 10b-16.[11] Although the district court dismissed the Rule 10b-5 claim because of a perceived failure to meet the "in connection with" requirement, it nevertheless permitted the Rule 10b-16 claim to proceed. Rule 10b-16, however, like 10b-5, was promulgated by the SEC pursuant to authority granted to the agency by Congress in section 10(b) of the Exchange Act. Since section 10(b) contains the "in connection with" language, all rules stemming from it must also contain this limitation. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976) (agency's rulemaking power cannot exceed power granted by Congress in the enabling statute). Indeed, Rule 10b-16 itself requires certain disclosures regarding credit terms of margin accounts "in connection with" a securities transaction; to hold that as a matter of law a misrepresentation regarding margin credit terms does not meet the "in connection with" requirement would appear to invalidate Rule 10b-16. SEC determinations regarding securities regulations are entitled to deference and we should not nullify an entire rule without good reason. See Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 537 (9th Cir.1984).
 
 III.
 A.
 
 19
 In its cross appeal, Bache requests us to overturn the district court's ruling that plaintiff may bring suit under Rule 10b-16. Since neither section 10(b) of the Exchange Act nor Rule 10b-16 explicitly provide for a private right of action, we must determine whether such a right may be implied from the statute and the rule.[12]
 
 
 20
 Much has been written, particularly by the Supreme Court, regarding how and when to find an implied right of action under a statute. See, e.g., Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). This case is somewhat unusual, however, because we must determine whether to imply a private right of action from an SEC rule, and only indirectly from the enabling statute. Thus the mode of statutory analysis developed by the Supreme Court in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and refined in subsequent decisions provides only a partial answer to the issue raised by the present case.
 
 
 21
 Deciding whether to imply a private right of action from an agency rule requires a two-fold inquiry. First, it is necessary to ascertain whether the statute under which the rule was promulgated properly permits the implication of a private right of action. To this determination, the method of analysis developed by the Supreme Court is fully applicable. If under Cort v. Ash and its progeny, a court finds that Congress did not intend the statute to be enforced by private actions, then the inquiry is concluded. No private right of action may be implied in such a situation since an agency's rulemaking power cannot exceed the authority granted to it by Congress. See, e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); 2 K. Davis, Administrative Law Treatise Sec. 7.8 (1979).
 
 
 22
 If the enabling statute permits a private right of action, a second inquiry must then be made: whether a private right of action should be implied from the agency rule at issue. See Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir.1984); Jablon v. Dean Witter & Co., 614 F.2d 677, 679 (9th Cir.1980). At this stage it is necessary to determine: (1) whether the agency rule is properly within the scope of the enabling statute, and (2) whether implying a private right of action will further the purpose of the enabling statute. See, e.g., Robertson, 749 F.2d at 536-39; Abeles v. Oppenheimer, 597 F.Supp. 532, 536 (N.D.Ill.1983). Where the enabling statute authorizes an implied right of action, courts should permit private suits under agency rules within the scope of the enabling statute if doing so is not at variance with the purpose of the statute. As one commentator has stated, if Congress intended to permit private actions for violations of the statute, "it would be anomalous to preclude private parties from suing under the rules that impart meaning to the statute." Note, Private Causes of Action Under SEC Rule 14e-3, 51 Geo.Wash.L.Rev. 290, 303 (1983).
 
 
 23
 At this second stage, an inquiry into "congressional intent" underlying an agency rule would not appear appropriate, because a court reaches this point of analysis only after it has already concluded that Congress intended the statute to give rise to private actions. Therefore, the second stage inquiry should focus on whether granting private parties the ability to bring suit under the rule will further the substantive purposes of the enabling statute. See Robertson, 749 F.2d at 537; see also Haas v. Wieboldt Stores, Inc., 725 F.2d 71, 73-74 (7th Cir.1984) (finding private right of action under SEC Rule 14a-9). Every rule that is promulgated under a statute providing for a private right of action will not automatically create such a right; the two-stage inquiry must be undertaken.[13]
 
 B.
 
 24
 We now apply the foregoing analytical framework to the present case. The first step in the inquiry is relatively simple. Since the seminal case of Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946), courts have found an implied private right of action under section 10(b) of the Exchange Act, the statute under which Rule 10b-16 was promulgated.[14] The Supreme Court confirmed the existence of private actions under the statute in 1971. Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971) ("It is now established that a private right of action is implied under Sec. 10(b)."). Despite the recent trend towards curtailing the scope of implied rights of action, the Supreme Court has continually reaffirmed that "[t]he existence of this implied remedy is simply beyond peradventure." Huddleston, 459 U.S. at 380, 103 S.Ct. 687; see also Wachovia Bank & Trust Co. v. National Student Marketing Corp., 650 F.2d 342, 351-53 (D.C.Cir.1980), cert. denied, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981) (private right of action under section 10(b) survives recent Supreme Court contractions of implied right of action doctrine).
 
 
 25
 Regarding the second stage of the inquiry, Bache contends that a private right of action may not be implied under Rule 10b-16 because the Commission exceeded its authority when it adopted the rule. Bache characterizes 10b-16 as a rule primarily regulating the conduct of broker-dealers or the granting of credit and as being totally collateral to the purposes of section 10(b). Defendants argue, therefore, that the rule should have been promulgated under section 15 of the Exchange Act, 15 U.S.C. Sec. 78o (registration and regulation of brokers and dealers) or under section 7 of the Exchange Act, 15 U.S.C. Sec. 78g (margin requirements). These sections, Bache maintains, do not provide private rights of action.
 
 
 26
 We need not ascertain whether a private right of action is authorized by sections 7 or 15 of the Exchange Act, or indeed whether Rule 10b-16 properly could have been promulgated under one of those sections. The Supreme Court has recognized that there is a certain amount of overlap among the various provisions of the Exchange Act and the other federal securities laws; consequently, a particular practice may be authorized or proscribed by more than one section. See Huddleston, 459 U.S. at 382-83, 103 S.Ct. at 687-88 ("no reason to carve an exception to Sec. 10(b) ... just because the same conduct may also be actionable under Sec. 11"); United States v. Naftalin, 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979) (" '[t]he fact that there may well be some overlap is neither unusual nor unfortunate' ") (quoting SEC v. National Securities, Inc., 393 U.S. 453, 468, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969)). Thus it is of no moment that Rule 10b-16 touches conduct that might also have been regulated under other sections of the Exchange Act. The only relevant inquiry is whether the rule is within the scope of authority granted to the Commission under section 10(b), which directs the SEC to prescribe anti-fraud rules "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. Sec. 78j(b). We conclude that it is.
 
 
 27
 The fundamental purpose of the Exchange Act is to promote the "full and fair disclosure" of material information in securities transactions. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477-78, 97 S.Ct. 1292, 1302-03, 51 L.Ed.2d 480 (1977); see also Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (purpose of the Act is " 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor ....' ") (quoting SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). Within the legislative schema enacted by Congress to accomplish this goal, section 10(b) is the "catch-all" anti-fraud provision. Huddleston, 459 U.S. at 382, 103 S.Ct. at 687; Chiarella v. United States, 445 U.S. 222, 234-35, 100 S.Ct. 1108, 1117-18, 63 L.Ed.2d 348 (1980). Section 10(b) fulfills its function by delegating to the Commission the duty of adopting rules that proscribe "any manipulative or deceptive device or contrivance." 15 U.S.C. Sec. 78j(b). The purpose of this section is to protect the public at large through the better operation of the securities market, and in particular to protect investors who purchase or sell securities, through full disclosure of all material information.
 
 
 28
 We agree with the Ninth Circuit that failure to disclose the credit terms of a margin account can constitute a "manipulative or deceptive device or artifice" within the meaning of the statute. See Robertson, 749 F.2d at 538-39; see also Liang, 540 F.2d at 1113 n. 25; Abeles v. Oppenheimer, 597 F.Supp. at 536. The credit terms charged by a brokerage firm may be of substantial significance in an investor's decision whether to purchase securities either on margin or at all. Because the cost of margin payments, as well as the method of their calculation, may cause an investor to purchase more securities than he or she otherwise might buy and may also increase the risks of trading on margin, nondisclosure of such information might serve as a fraudulent or deceptive device on investors. The rule therefore serves to protect investors, and thus we cannot say that the Commission exceeded its authority when it adopted a provision requiring disclosure of such information.
 
 
 29
 This brings us to the crux of the second inquiry: whether permitting a private right of action furthers the purposes of section 10(b). To some extent this question has already been answered in the affirmative by the determination that Rule 10b-16 is within the statutory grant of authority. As with Rule 10b-5, allowing a private right of action under Rule 10b-16 will advance the statutory goals of promoting full disclosure of material information and of protecting investors from fraudulent practices.[15] In the present case, Angelastro alleges that Bache failed to divulge to her all the credit terms of her margin account. As a result of this concealment, plaintiff alleges that she was misled into purchasing securities that she otherwise would not have bought. Permitting private plaintiffs who have been harmed by a violation of Rule 10b-16 to bring private damages suits furthers the goal of section 10(b). Such actions will protect investors from improper nondisclosures and at the same time encourage brokerage firms to adhere to the rule's prescriptions.
 
 IV.
 
 30
 The district court's decision that plaintiff may proceed with her complaint under Rule 10b-16 will be affirmed. In addition, the order of the district court dismissing plaintiff's claim under Rule 10b-5 will be reversed and the case remanded for proceedings consistent with this opinion.
 
 
 
 *
 The Honorable John Minor Wisdom, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 The district court has not yet ruled on the issue of class certification; accordingly, we will consider Angelastro as the sole plaintiff for purposes of this opinion
 
 
 [2]
 Defendants will be referred to collectively as Bache
 
 
 [3]
 Section 10(b) of the Exchange Act provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. Sec. 78j(b) (1982).
 
 
 [4]
 Rule 10b-5 states:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (a) to employ any device, scheme, or artifice to defraud,
 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
 in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1984)
 
 
 [5]
 Other requirements for a 10b-5 claim are (1) a material misrepresentation; (2) a purchase or sale of a security; and (3) scienter on the part of the defendant who made the misrepresentations. See e.g., Ketchum v. Green, 557 F.2d 1022, 1025 (3d Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485, 493 (S.D.N.Y.1984)
 
 
 [6]
 Churning occurs when a securities broker buys and sells securities without regard to the customer's investment objectives, in order to generate commissions. See Thompson v. Smith Barney, Harris Upham & Co., Inc., 709 F.2d 1413, 1416 (11th Cir.1983)
 
 
 [7]
 This case does not involve the hypothetical case posited by defendants in which an investor borrows from his margin account for other purposes and pledges securities as collateral
 
 
 [8]
 In one sense defendants appear to be arguing that a misrepresentation of the credit terms of a margin account cannot be material to an investor's decision whether to purchase securities. We are unable to say that, as a matter of law, a reasonable investor would not rely on such a consideration when deciding whether to purchase securities in the first place and if so whether to purchase them on margin. See Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 647 (3d Cir.1980) (defining materiality as " 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder' ") (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976))
 
 
 [9]
 A pledge of securities can be a "sale" for purposes of the securities laws. Rubin v. United States, 449 U.S. 424, 428-30, 101 S.Ct. 698, 700-02, 66 L.Ed.2d 633 (1981)
 
 
 [10]
 Because we hold that plaintiff's purchase of securities meets the "in connection with" requirement, we do not reach Angelastro's alternative theory that her purchase of securities on margin constitutes a pledge (sale) that satisfies the "in connection with" requirement
 
 
 [11]
 Rule 10b-16 provides (in relevant part) that
 (a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer
 (1) is given or sent at the time of opening the account, a written statement or statements disclosing (1) the conditions under which an interest charge will be imposed; (ii) the annual rate or rates of interest that can be imposed; (iii) the method of computing interest; (iv) if rates of interest are subject to change without prior notice, the specific conditions under which they can be changed; (v) the method of determining the debit balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts; (vi) what other charges resulting from the extension of credit, if any, will be made and under what conditions; and (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required ...
 
 
 [17]
 C.F.R. Sec. 240.10b-16 (1984)
 
 
 [12]
 The only two courts of appeals that have considered this question have found an implied right of action under Rule 10b-16. See Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530 (9th Cir.1984); Liang v. Dean Witter & Co., 540 F.2d 1107 (D.C.Cir.1976); cf. Zerman v. Ball, 735 F.2d 15 (2d Cir.1984) (raising but not reaching the question). In addition, a majority of the district courts confronting the issue have also found a private right of action under Rule 10b-16. See Slomiak v. Bear Stearns & Co., 597 F.Supp. 676, 677-81 (S.D.N.Y.1984); Abeles v. Oppenheimer & Co., 597 F.Supp. 532, 535-36 (N.D.Ill.1983); Haynes v. Anderson & Strudwick, Inc., 508 F.Supp. 1303, 1318-21 (E.D.Va.1981). But see Establissement Tomis v. Shearson Hayden Stone, Inc., 459 F.Supp. 1355, 1361 (S.D.N.Y.1978); Furer v. Paine, Webber, Jackson & Curtis, Inc., [1982] Fed.Sec.L.Rep. (CCH) p 98,701 (C.D.Cal.1982)
 
 
 [13]
 In addition, the fact that a given rule impliedly authorizes a private action does not definitely determine whether a private action is proper in every suit brought under the rule. Certain claims may be found not to fall within the substantive ambit of the rule. For example, it is now beyond dispute that a private right of action exists under Rule 10b-5. See, e.g., Herman & MacLean v. Huddleston, 459 U.S. 375, 380 & n. 10, 103 S.Ct. 683, 686 & n. 10, 74 L.Ed.2d 548 (1983); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 95 S.Ct 1917, 1922, 44 L.Ed.2d 539 (1975). Nevertheless, the Supreme Court has delimited the scope of actions under the rule, such as by requiring the plaintiff to be a purchaser or seller of securities. See Blue Chip, 421 U.S. at 723, 95 S.Ct. at 1917. Whether Angelastro's theory of recovery meets the "in connection with" requirement of section 10(b) is a similar substantive question
 
 
 [14]
 In determining whether a private right of action exists under Rule 10b-16, a number of courts have mistakenly looked to the intention of Congress when it enacted the Truth-in-Lending Act, 15 U.S.C. Secs. 1601 et seq. (1982) (TILA). In 1968, when Congress passed TILA--which requires disclosure of credit terms in loan transactions--it expressly exempted securities accounts from the Act's coverage, 15 U.S.C. Sec. 1603(2), and declared its intention that the SEC adopt a rule requiring substantially similar disclosure for securities accounts. See S.Rep. No. 392, 90th Cong., 1st Sess. 9 (1967). Thereafter, the Commission adopted Rule 10b-16 as an analogue to TILA for margin accounts. See Securities Exchange Act Release No. 34-8773, 34 F.R. 19717 (1969). Because TILA explicitly creates a private right of action, the court in Haynes, 508 F.Supp. at 1318-21, decided that Congress must have intended a private right of action for Rule 10b-16. The court in Furer, [1982] Fed.Sec.L.Rep. (CCH) p 98,701 at 93,495, drew the opposite conclusion from the fact that Congress did not include securities accounts within TILA. Regardless of which inference is proper, Congress' intent to permit private rights of action must stem from Sec. 10(b) of the Exchange Act, the provision which granted the Commission the power to adopt the rule, not from TILA. See Robertson, 749 F.2d at 535
 
 
 [15]
 In contrast, the court in Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 465 F.Supp. 1233, 1237 (S.D.N.Y.1979), refused to imply a private right of action under Rule 15c3-3(b) because that rule merely provides a standard of conduct to be followed by a broker-dealer for the purpose of insuring the orderly operation of the exchange. Unlike Rule 10b-5, Rule 15c3-3(b) is not aimed at preventing fraud on investors. Cf. Warren v. Bokum Resources Corp., 433 F.Supp. 1360, 1366-68 (D.N.M.1977) (finding private right of action under Rule 10b-13)